IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| William Wells, *et al.*, | : | |
| Plaintiffs | : | Civil Action 2:11-cv-00217 |
| v. | : | Judge Sargus |
| Brandon Rhodes, *et al.*, | : | Magistrate Judge Abel |
| Defendants | : | |

# Report and Recommendation

This matter is before the Magistrate Judge on plaintiff's motion for default judgment against defendant Alisa Dawn Gandee (doc. 41). Defendant Alisa Dawn Gandee was served with summons and complaint on June 8, 2011 (doc. 34). On August 2, 2011 the Court referred this matter to the Magistrate Judge for a hearing and report and recommendation. The hearing was held on August 22, 2011, and defendants Alisa Dawn Gandee and Larry Matthew Gandee appeared before the Magistrate Judge. At the hearing, plaintiffs' amended their motion for default judgment to include defendants Larry Gandee and D.G. Defendants Larry Gandee and D.G. were served with summons and complaint on June 8, 2011 (docs. 35 & 33).

Allegations in the First Amended Complaint. Plaintiffs William Wells and Priscilla Wells live in Marengo, Ohio with their four children, Jalisa Gibson, Shanay Gibson, J.W., and J.D.W. Am. Compl. at ¶ 2. Plaintiff are African Americans, and there are few, if any, African Americans living in Marengo. *Id.*

On March 2, 2011, defendants Brandon Rhodes and D.G., acting in conspiracy with one another, soaked a large wooden cross with alcohol and wrote in large letters "KKK Will Make U Pay" on the horizontal part of the cross and "NIGGER" on the vertical part of the cross and set it on fire on the lawn of plaintiffs. *Id*. at ¶ 4.

Jalisa Gibson and Shanay Gibson saw the cross when they woke up on the morning of March 3, 2011. William Wells and Priscilla Wells, who are truck drivers, were working and not at home at the time. Shanay Gibson contacted the Morrow County Sheriff's department and the media. *Id*. at ¶ 6.

On March 4, 2011, D.G. bragged to his friends that he was involved in the cross burning. When he saw Shanay Gibson at school, he stared at her intensely. D.G. sent Shanay Gibson a "friend request" on the social networking website Facebook. *Id*. at ¶ 7. Prior to the cross burning, D.G. regularly made taunting, derogatory, intimidating and harassing comments to Shanay Gibson and J.W. because of their race. *Id*. at ¶ 10. Approximately one week after the cross burning incident, D.G. attempted to contact J.W. by sending him a "friend request" on Facebook. *Id*. at ¶ 12.

The Morrow County Sheriff's department began investigating the cross burning. Plaintiffs were fearful that their lives were in danger. *Id*. at ¶ 8. Rhodes' parents came to plaintiffs' residence and stated that Rhodes had confessed to them that he was involved in the cross burning. *Id*. at ¶ 9.

The actions of defendants have terrorized plaintiffs. Plaintiffs are afraid for their lives and are concerned that defendants, and/or their sympathizers, will try to harm them.

The complaint further alleges that defendants Larry Matthew Gandee and Alisa Dawn Gandee are subject to Ohio Revised Code § 32307.07 because they are the parents of the minor, D.G., and D.G. engaged in ethnic intimidation against plaintiffs based on their race.

<u>Default Judgment</u>. If a defendant who is served with summons and complaint or who waives service fails to timely answer or otherwise respond to the complaint, plaintiff may request and the Clerk of Court will normally enter default. Rule 55(a), Fed. R. Civ. P. The Clerk may enter judgment only "[w]hen the plaintiff's claim against a defendant is for a sum certain or for a sum which can by computation be made certain . . . ." *Id.*

When a defendant is in default, plaintiff's well-pled factual allegations relating to liability are normally accepted as true. *See Antoine v. Atlas Turner, Inc.*, 66 F.3d 105, 110 (6th Cir. 1995); *Fair Housing of Marin v. Combs,* 285 F.3d 899, 906 (9th Cir. 2002); *Kelley v. Carr*, 567 F. Supp. 831, 841 (W.D. Mich 1983). On the other hand, allegations as to damages are not accepted as true. *See Antoine,* 66 F.3d at 110; *Kelley*, 567 F. Supp. at 841; *see also Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992) ("While a party's default is deemed to constitute a concession of all well pleaded allegations of liability, it is not considered an admission of damages."). "Ordinarily, the

3

District Court must hold 'an evidentiary proceeding in which the defendant has the opportunity to contest the amount [of damages].'" *Antoine,* 66 F.3d at 110 (quoting *Greyhound Exhibitgroup, Inc.*, 973 F.2d at 158).

Rule 55(b)(2) provides that a court may hold a hearing on a motion for default judgment when "it is necessary to take an account or to determine the amount of damages or to establish the truth of any averment by evidence or to make an investigation of any other matter . . . ." When a motion for default judgment is filed and the affidavits supporting the motion are insufficient for the Court to determine damages, the District Judge usually refers the motion to the Magistrate Judge for a hearing at which plaintiff has the burden of proving damages by a preponderance of the evidence. The Court may also require a *prima facie* showing of liability. *See, Moore v. United Kingdom,* 384 F.3d 1079, 1090 (9th Cir. 2004); *Ramos-Falcon v. Autoridad de Energia Electirica,* 301 F.3d 1, 2 (1st Cir. 2002); *Quirindongo Pacheco v. Rolon Morales,* 953 F.2d 15, 16 (1st Cir. 2002); *TeleVideo System, Inc. v. Heidenthal,* 826 F.2d 915, 917 (9th Cir. 1987); *Doe v. Qi,* 249 F. Supp.2d 1258, 1272 (C.D. Calif. 2004); *In re DIRECTV, Inc.,* 2004 WL 2645971 (N.D. Cal. July 26, 2004).

<u>Alisa Dawn Gandee</u>. Ms. Gandee testified that she currently lives with her son, D.G, who is enrolled at Highland High School.

<u>Jalisa Gibson</u>. Jalisa Gibson testified that on the morning of March 3, 2011, she woke up and saw something out the window. She realized it was a cross. She was shocked, hurt, and scared. The words "KKK will make you pay" and the "N word"

4

were written on the cross. She testified that she was afraid that someone would come back and do something if they didn't leave. She could see an indentation in the lawn where an attempt was made to stick it in the yard. Her sister called law enforcement and contacted the media. At some point she learned that Brandon Rhodes and D.G. were responsible for placing the cross in her yard. She was scared because she did not know what would happen next.

Following the incident, Jalisa began to experience bad headaches. She used to work at Petsmart in Dublin, but she had to leave for work at 5 o'clock in the morning to open the store. She was afraid to leave her house when it was still dark outside. She changed her schedule, but she received a bad review for doing so. Ultimately, she had to quit her job. The family dynamics have changed since the incident. She said that they were all scared and frustrated. Her parents had changed the rules in the house and had become more strict. Jalisa feared for her dog's safety when she let him out of the house. On one occasion her car indicated that her gas cap was not on securely, and she worried that her car had been tampered with.

Shanay Gibson. Shanay Gibson testified that when she woke up on March 3, 2011 at first she did not think anything about the cross because she thought it was a neighbor's mailbox that had been knocked down. When she learned it was a cross in her yard, she was very scared and wanted to leave. The cross had "KKK will make you pay" and "niggers" written on it. The area around the cross was burned. She called her dad on the telephone. He was shocked and told her to call the police. She also called

5

Channel 4 news because the police did not seem to be taking it seriously. It took the police an hour to arrive. Shanay said that her family was the only black family in the area. She had seen D.G. at school a few times. Shanay was friends with Brandon's sister and had been to their house. After the cross burning, D.G. stared at her at school and told people that he had done it. She didn't feel safe because she didn't know what he would do next. She doesn't sleep very much because she worries that something else will happen. She is not able to do much. She also has headaches.

J.W. J.W. testified that he did not see the cross in his yard until he returned home from school on March 3, 2011. He saw the writing on the cross. He felt as though the people who did this were still after him. He had seen D.G. at school and had the same lunch period as him. He was worried for his family and worried that another incidence would occur. His whole family was nervous and scared. He thought that this type of thing no longer happened in 2011. He had only lived in Marengo for about a year before the incident occurred. Prior to the cross burning, he had felt comfortable in Marengo.

Priscilla Wells. Ms. Wells became aware of the incident when she overheard her husband talking to her daughter. She immediately tried to figure out how she could get home to her family as quickly as possible. Despite her concern, she could not abandon her work or the truck. She and her husband work as a team driving a truck. It took them 8 ½ hours to get home from Atlanta. By the time she returned home, the cross had been removed. She viewed photographs of the cross, but not the cross itself. The photographs were very disturbing.

At some point, she discovered through her daughter Shanay that Brandon Rhodes, D.G., and a third party were responsible. She no longer trusts people and fears for her family when she is away at work. She is still employed as an over the road truck driver. She never expected something like this to occur and doesn't know what to expect in the future.

Family rules changed as a result of the incident because she no longer knew who to trust. They live near a wooded area, and she felt anything is possible. Although they have a neighbor in the same housing development, no one saw anything the night the cross burning occurred. Now, she always is on guard. Before the incident, she never noticed cars, but now she worries every time she notices a car driving slowly past her house. She is more stressed and experiences constant fear. She altered her work schedule so that she could be at home. Her children lost their freedom, and initially no one was allowed to go anywhere. She remains cautious.

Immediately after the incident occurred, they considered moving but decided not to because they felt as though they should not have to move. She described the event as a nightmare. She had let her guard down and believed that she could live wherever she chose to. She can no longer think of it as home because there are people who actually hate her. A burning cross signifies hate.

Afterward, people from the community came to her house. Some of the people appeared to worry more about what people thought of the community rather than how her family felt.

Brandon's parents came to her house and apologized for their son's behavior. Although she could see that his mother was upset, she remains concerned about her family. No one has spent a day in jail. She doesn't know anything about the families of the boys who did this, and the beliefs demonstrated by the cross burning must have come from somewhere.

Her work schedule consists of six days of driving and one day off. She and her husband drive to Florida and Boston, Massachusetts to deliver pharmaceuticals. They take turns driving, ten hours at a time. It is a dedicated account and they operate out of Groveport.

They moved to Marengo because she believed a rural community would be a good place to raise children. They were originally from Akron. Children raised in the city are exposed to a lot of negativity. They believed country living would be better for them. They also believed they would have better schools. They had taken in other family members. Although she had previously encountered racism here and there, she never experienced anything like this before.

<u>William Wells</u>. Mr. Wells testified that he first learned of the incident when Shanay called him. He instructed Shanay to call the police. He was very worried and wondered if his children would be safe until they got home. They could not abandon the truck and had to drive back from Atlanta. When she didn't get a response from the police, he told Shanay to contact the media when because the media can get results.

He saw pictures of the cross. He told his children to put it in the garage when the sheriff had left it behind. He had not been familiar with Brandon Rhodes or D.G. prior to this incident.

The first thing that went through his mind when he learned of the cross burning was hate and that they were not wanted in the community. He believes you should be able to live where you want to live. He viewed the cross burning as a threat. Nothing can take away the fear. Any person who builds it knows what it means. He did not know what the perpetrators might come back to do. It is difficult for him to be comfortable with his children in school.

He believed that if they had moved, hate would have prevailed. Although people apologized for what happened, he felt as though some of them smirked when they were doing it. His interactions with people have changed. He tells his children that they don't have any friends, just associates. Some people believe that they are only trying to get money. Family dynamics also changed. The children were followed home from a Pilot truck stop, and they had to speed to get home. For a period of time, the children were no longer permitted to go to functions or parties or participate on the track team. His wife had to stop working and he had to find another team member to work with. He was so preoccupied by concerns about his family's safety that he passed a weigh station while working. He was pulled over and received a ticket.

He currently is on light duty and works from 7 a.m. to 3 p.m. This is temporary, and he misses the road. His children are permitted to visit friends on occasion. He does

9

not believe his children can have friends, only acquaintances. His daughter was friends with Brandon Rhodes's sister.

      Deposition Testimony of Brandon Rhodes. Rhodes testified that he learned about the Klu Klux Klan ("KKK") in history class. He does not know of any one who is a member of the KKK. He is not a member of the KKK. He understands the KKK to be opposed to any non-white people and that they hurt or scared people. He has never visited a KKK website or attended a meeting. All the information he knew about the KKK came from what he learned in his history class. He did not agree with the beliefs of the KKK. He believed that the KKK used to bully people, throw bricks through windows, and burn crosses. Rhodes testified that he believed that everyone is created equal, and he would not become a member of the KKK because he didn't agree with their philosophy. He believes non-white people are no different than white people. He does not care if white people are friends with or date non-white people.

      Rhodes acknowledged that he participated in the cross burning at the Wells's home. D.G. assisted him the cross burning. He does not know who came up with the idea of burning a cross. Prior to deciding to burn a cross, Rhodes, D.G., and D.G.'s cousin had been drinking a 30 pack of beer at D.G.'s house. He does not remember the events leading to the decision to burn the cross. He said that they were drunk and being stupid. D.G. said that Rhodes's sister had been hanging out with either J.W. or J.D.W. and Shanay at school. D.G. asked him if it bothered him, and he said that it did not. Then, D.G. brought up the idea of a burning a cross. He knew that his sister was friends

with either J.W. or J.D.W. A few minutes later, D.G. went out to the barn and returned with wood to make a cross.

D.G.'s parents were not home. His father was in Georgia, and his mother was at work. D.G. brought two boards on the porch and began nailing the boards together. Rhodes did not help him put the boards together, and he did not say anything to D.G. while he was doing it. One board was approximately five feet long, and the other was four feet long. While D.G. put the boards together, Rhodes drank his beer. He does not remember what they talked about as D.G. made the cross. Rhodes was not present when D.G. wrote "KKK will make you pay" and the "n-word" on the cross. D.G. said that they were going to put the cross in Shanay's yard, and Rhodes said okay.

Rhodes helped D.G. load the cross into the back of Rhodes's truck. They drove to the Wells's house and parked down the road. They carried the cross to their yard and laid it flat. D.G. poured gasoline on the cross and lit it on fire. They took off running. They drove back to D.G.'s house, and Rhodes dropped him off and drove home.

Rhodes viewed the cross burning as a senseless prank, a joke, and an act of stupidity. At the time, he did not think about the meaning of the words, "KKK will make you pay." Afterwards he recognized it as a threat. He understands that a burning cross signifies hate. If he would have been sober, he would have recognized that, but he wasn't thinking. At the time, he considered it a joke. It was not being constructed to insinuate hate against African-Americans. Rhodes figured that everyone would look at it as a prank or a joke and not as a threat. He did not believe it would be threatening

11

because you could tell it was not from the KKK. Rhodes did not even know that the KKK still existed until he talked to the detective.

Discussion. Plaintiffs are seeking default judgment against defendants Alisa Gandee, Larry Gandee, and D.G. Plaintiffs maintain that defendants Larry Gandee and Alisa Gandee are subject to Ohio Revised Code § 2307.07 because they are parents of the minor, D.G., and D.G. engaged in ethnic intimidation against plaintiffs based on their race. Section 2307.07 states:

> (A) Any person who suffers injury or loss to person or property as a result of an act committed in violation of section . . . 2927.12 of the Revised Code has a civil action against the offender and may recover in that action full compensatory damages, including, but not limited to, damages for emotional distress, and may recover punitive or exemplary damages, court costs, other reasonable expenses incurred in maintaining that action, and the reasonable attorney's fees incurred in maintaining that action.
>
> (B)(1) Any person who suffers injury or loss to person or property as a result of an act committed in violation of section . . . 2927.12 of the Revised Code by a minor child has a civil action against the parent of the minor child and may recover in that action compensatory damages not to exceed fifteen thousand dollars, court costs, other reasonable expenses incurred in maintaining that action, and reasonable attorney's fees incurred in maintaining that action. A parent and the parent's minor child are jointly and severally liable as specified in this division for the injury or loss to person or property caused by the minor child's act committed in violation of section 2909.05, 2927.11, or 2927.12 of the Revised Code. If a person recovers compensatory damages from a parent of a minor child pursuant to this division, that recovery does not preclude the person from maintaining a civil action against the minor child pursuant to division (A) of this section.

Ohio Rev. Code § 2307.70(A) & (B). Section 2927.12 of the Ohio Revised Code states:

> (A) No person shall violate section 2903.21,[1] 2903.22, 2909.06, or 2909.07, or division (A)(3), (4), or (5) of section 2917.21 of the Revised Code by reason of the race, color, religion, or national origin of another person or group of persons.
>
> (B) Whoever violates this section is guilty of ethnic intimidation. Ethnic intimidation is an offense of the next higher degree than the offense the commission of which is a necessary element of ethnic intimidation.

Ohio Rev. Code § 2927.12

Despite testimony concerning lost wages resulting from Mrs. Wells's need to temporarily stop working with her husband, no evidence was submitted concerning the amount of lost wages. Similarly, Jalisa testified that she had to leave her position at Petsmart as a result of the cross burning and that she began to suffer severe headaches. No evidence was submitted documenting Jalisa's lost wages, and no medical evidence was submitted demonstrating a link between the cross burning and Jalisa's subsequent headaches. As a result, plaintiffs have not demonstrated that they are entitled to compensatory damages for lost wages or any physical impairment arising from the conduct of Rhodes of D.G.

---

[1]Section 2903.21 states in pertinent part:

> (A) No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person, the other person's unborn, or a member of the other person's immediate family.
> (B) Whoever violates this section is guilty of aggravated menacing.

Ohio Rev. Code § 2903.21.

13

Plaintiffs have demonstrated, however, that they are entitled to compensatory damages for emotional distress. As a result, I RECOMMEND that plaintiffs Jalisa Gibson, Shanay Gibson, J.W., Priscilla Wells, and William Wells each be AWARDED $2,500 in compensatory damages in addition to court costs, other reasonable expenses incurred in maintaining that action, and reasonable attorney's fees incurred in filing suit and obtaining default judgment against these defendants.

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto.  28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *Thomas v. Arn*, 474 U.S. 140, 150-152 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005); *Miller v. Currie,* 50 F.3d 373, 380 (6th Cir. 1995).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Willis v. Sullivan,* 931 F.2d 390, 401 (6th Cir. 1991).

The Clerk of Court is DIRECTED to serve this Order on defendant Alisa Dawn Gandee, Larry Gandee, and D.G., 6160 St. Rt. 229, Marengo, Ohio 43334.

s/ Mark R. Abel  
United States Magistrate Judge
